UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| CORNELIUS TERRELL McDANIEL, # 411217, | ) ) ) | |
| Petitioner, | ) ) | Case No. 1:06-cv-125 |
| v. | ) ) | Honorable Janet T. Neff |
| KEN McKEE, | ) ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) ) ) | |

_____

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C.
§ 2254. Petitioner is serving a sentence of 20-to-75 years' imprisonment imposed on June 17, 2002,
following his conviction of second-degree murder by a Kent County Circuit Court jury for strangling
Jose Montalvo. MICH. COMP. LAWS § 750.317. The Michigan Court of Appeals summarized the
events giving rise to the second-degree murder convictions of petitioner and his co-defendant,
Anthony Price:

> Defendants were convicted of murdering Jose Montalvo after meeting with him to purchase
> marijuana. Defendants left the victim's body in a secluded area and then drove the victim's
> car to their home state of Alabama. The victim's body was discovered about a month later.
> It was too decomposed for the medical examiner to determine a specific cause of death, but
> defendants admitted in statements to the police and their friends that, first, they strangled the
> victim. Then, as the victim regained consciousness, they strangled him again until he died.
> Defendants stated that they argued with the victim about the price of the marijuana, but
> claimed they did not strangle him until after he allegedly reached for a gun. Defendants
> claimed that they took the victim's gun and discarded it along I-75 in Ohio as they returned
> home to Alabama.
>
> Defendants were tried on charges of first-degree premeditated murder and felony murder.
> At trial the prosecutor theorized that the victim was unarmed when he was killed.

Defendants claimed that they acted in lawful self-defense.  The trial court instructed the jury that lawful self-defense was a complete defense to both first-degree murder and the lesser offense of second-degree murder.  But if the jury found a realistic possibility that defendants acted in self-defense, but were doing something illegal like buying drugs, the crime would be manslaughter.  The jury found defendants guilty of second-degree murder.

(Michigan Court of Appeals Op. at 1-2, docket # 31).

Petitioner argues that he is entitled to federal habeas corpus relief on two grounds:

1.   Petitioner's conviction was obtained in violation of his rights under the Fourteenth Amendment's Due Process Clause[1] because the trial court failed to instruct the jury on the lesser included offense of voluntary manslaughter based on provocation.

2.   Petitioner's rights under the Fourteenth Amendment's Due Process Clause were violated because he was "not sentenced on the basis of accurate information" when he received fifty points under offense variable 7 (OV 7) of Michigan's sentencing guidelines for "aggravated physical abuse."

(Petition, docket # 1, ¶¶ 12(B), (D)).  Respondent has filed an answer to the petition (docket # 14) asserting that the petition should be denied for lack of merit.  This matter has been referred to me for review of the record and submission of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Habeas Corpus Proceedings in the District Courts. I find that the grounds raised by petitioner do not provide a basis for granting his request for habeas corpus relief.  I recommend that the petition be denied.

---

[1]Petitioner mentions the "5th, 6th, and 14th" Amendments in his Ground 1 due process claim. (docket # 1, ¶ 12(B)).  The Fifth Amendment's Due Process Clause applies to the federal government, *see e.g.*, *Castillo v. McFadden*, 399 F.3d 993, 1002 n.5 (9th Cir. 2005), and the Sixth Amendment does not contain a due process clause.  The references to the Fifth and Sixth Amendments add nothing to petitioner's claim under the Fourteenth Amendment's Due Process Clause.

**Proposed Findings of Fact**

A.     Trial Court Proceedings

Petitioner's trial in the Kent County Circuit Court began on April 15, 2002, and concluded on April 26, 2002, with the jury's verdicts finding petitioner and Anthony Price guilty of second-degree murder[2].  Petitioner and Price were charged with open murder.  They claimed that Jose Montalvo had pulled a gun on them while they were attempting to buy marijuana from him, and that they had strangled Montalvo in self-defense.

Sarah Engel testified she met petitioner while she was living in Alabama.  (TT4, 41). Engel later moved back to Michigan.  Engel was planning her graduation party for the weekend of May 30, 2001.  (TT4, 42).  Petitioner was coming up to Michigan from Alabama and he was bringing Anthony Price along.  (TT4, 43).  Their truck broke down on I-75 near Piqua, Ohio. Trooper Elizabeth A. Cress of the Ohio State Highway Patrol testified that on May 19, 2001 she encountered petitioner and Price.  They told her that the truck had broken down on the way from Alabama to Michigan.  (TT7, 4-9).  The police contacted Sarah Engel, and her father came down to Ohio on May 20, 2001, and gave petitioner and Price a ride to Wayland, Michigan, where the Engel family lived.  (TT3, 54; TT4, 43-44).

Petitioner and Anthony Price stayed in Michigan for a few days.  (TT3, 66, 76).  They spent a night sleeping in a car in the driveway of the Engel's apartment  (TT3, 54, 66; TT4, 45), two nights at the Knights Inn motel on 28th Street in Grand Rapids (TT4, 45-46; TT5, 66-69), and one night at the Guiding Light Mission in Grand Rapids.  (TT2, 135; TT3, 56; TT4, 56; TT7, 20).

_____

[2] The trial transcript spans ten volumes (TT1-TT10), reflected in the record of this court as docket #'s  20-29.

Heather Smith, Anthony Price's sister, testified that her brother called her in Alabama from Michigan on May 24, 2001.  Price asked Smith  to complete a three-way call to 616-455-4045, the home phone number of Jose Montalvo and his girlfriend Tiffany Harper.  (TT5, 41-45).  Phone records revealed that Price called Smith at 9:53 p.m. from a pay phone at the Shell station located at the intersection of 28th Street and Division Avenue, next door to the Knights Inn.  (TT5, 57).  Heather Smith testified that it was obvious that her brother was arranging some sort of drug deal.  (TT5, 47, 54).  She overheard the arrangement to meet at the gas station.  (TT5, 46).  She also heard "Joe" ask a woman in the background whether he could borrow her car.  (TT5, 46).

Tiffany Harper testified that she was Jose Montalvo's girlfriend and that she last saw Jose Montalvo on May 24, 2001, at approximately 10:30 p.m.  Harper testified that she knew that Montalvo was leaving to meet someone at the Shell station on 28th Street.  She knew that  Montalvo had a quarter ounce of marijuana with him and that he was going out to sell it. (TT 2, 103-04, 114, 120).  She allowed Montalvo to take her 1996 Plymouth Breeze.  Among the items in this car when Montalvo borrowed it were a grill, a child's car seat, and a CD player.  (TT2, 111).

Jose Montalvo had a record of two previous arrests for possession of marijuana.  (TT8, 37).  Witnesses testified that Montalvo did not carry a gun, and that it would have been unusual for him to do so in connection with the sale of a small amount of marijuana.  Among other things, possession of a gun during the sale of this relatively small amount of marijuana would have elevated the crime to a felony offense.  (TT8, 71, 75, 116, 124).

Petitioner and Price abruptly left the State of Michigan on May 25, 2001, without explanation.  They came to Sarah Engel's house near midnight on the night Jose Montalvo disappeared.  (TT3, 69).  Petitioner offered no explanation regarding why they were leaving.  (TT4,

-4-

56-58).  Petitioner and Price did not stop in Piqua, Ohio, for the truck that had broken down a few days earlier.  The truck remained in a police impound lot at the time of petitioner's trial.  (TT7, 13).

On May 27, 2001, Tiffany Harper's car was found in a wooded area near the small town of Helfin, Alabama.  Anthony Price's family lived nearby.  (TT6, 48-49).  The car was taken to the police impound lot.  Petitioner's fingerprints were found on the car's cigarette lighter and on a potato chip bag.  Anthony Price's DNA matched the DNA found on a cigar tip.  Jose Montalvo's fingerprint was on the car's rearview mirror.  (TT6, 10-15, 46-48).

On June 23, 2001, Jose Montalvo's decomposed body was found along U.S. 131 near the 28th Street intersection by a man looking for returnable bottles and cans.  (TT3, 4).  Montalvo's body had been partially covered by brush in an apparent effort to conceal it.  (TT3, 15; TT4, 5).  The only clothing found with the body was a T-shirt and socks.  (TT3, 10, 14, 22, 36; TT4, 16).  Montalvo's body was positively identified through dental records and the distinctive T-shirt that he had been wearing on the night he disappeared.  (TT2, 94, 140; TT3, 26;  TT4, 11-12).

Police learned of McDaniel's and Price's involvement in the killing through statements they had made to their friends:  Ian Green, Trent Jackson, and Michael Smith.  (TT4, 111-12).  Ian Green testified that Anthony Price described how he and petitioner had strangled a man in Michigan (TT4, 133).  Price indicated that the killing had occurred during an attempt to buy marijuana.  (TT4, 136).  Neither Price nor petitioner indicated to Green that they had seen the victim with a gun.  (TT4, 136-37).  They told Green that they had stolen the victim's car and dumped his body in northern Alabama.  (TT4, 117-18, 137-38).  Petitioner and Price asked Green to use his computer to look up the victim's name and determine whether there was a report in the Grand Rapids

area of a missing person or stolen car.  (TT4, 140).  Green observed Anthony Price throw the

victim's car keys into a trash can at a Texaco station in Helfin, Alabama.  (TT4, 141).

Mike Smith testified that he heard Price toss the car keys into the trash can.  (TT4,

107, 122, 124).  The version of events defendants related to Mike Smith was similar.  The seller had

driven Price and McDaniel to a secluded area.  McDaniel and Price claimed that during an argument

they saw the seller reach for something, but did not know whether it was a gun.  They jumped on the

man and strangled him.  (TT4, 104-05, 108, 120).  Mike Smith testified that petitioner and Price told

him that they had dumped the victim's body somewhere between Michigan and Northern Alabama.

(TT4, 113).

Trent Jackson testified that the purpose of petitioner and Price's trip to Michigan had

been to "hook up" drug deals in order to make some money.  (TT7, 30-31).  The version of events

related to Jackson included the victim pulling a gun from under the front seat.  (TT7, 34, 52, 55).

McDaniel and Price took everything the man had, including his cash, marijuana, and car.  (TT7 37,

38).  Jackson testified that he had been told that petitioner and Price brought the gun back to

Alabama before disposing of it.  (TT7, 55-56).

Shortly after Jose Montalvo's body was found, Officer Jesse Lopez of the Wyoming

Police Department and Detective John Bylsma of the Grand Rapids Police Department traveled to

Alabama where they interviewed Ian Green, Trent Jackson, and Michael Smith.  (TT7, 61).  On June

25, 2001, roughly a month after Montalvo had been killed, Officer Lopez interviewed petitioner.

(TT7, 95).  The jury learned of petitioner's version of events through Officer Lopez's testimony and

the written statement that petitioner gave to the police that was offered into evidence as Exhibit 49

and admitted without objection.  (TT7, 70-71).  Petitioner related that he had first encountered Jose

Montalvo when he and Price were walking along Division Avenue towards 28th Street.  Montalvo pulled up alongside them and asked if they wanted to buy some marijuana.  They replied that they already had some.  "Joe" gave them his telephone number and told them to call him when they needed more.  (TT7, 72).  Hours later they arranged to meet Jose Montalvo through the three-way call that Heather Smith had arranged.  (TT7, 74).  Petitioner and Price met Jose Montalvo in the parking lot of the Shell station at the intersection of 28th Street and Division.  Both men were bigger than Montalvo, who was only  5' 8" tall and weighed roughly 150 pounds.  By contrast, petitioner was 6' 1" and weighed from 230 to 240 pounds and Anthony Price was  5' 11" and weighed 160 pounds.  (TT7, 65, 112).  McDaniel and Price got into the car with Montalvo, petitioner in the passenger seat and Price in the back seat behind Montalvo.  (TT7, 74).

Montalvo drove a short distance and went down the two-track road located west of the Grand Rapids Inn.  (TT7, 74-75).  Petitioner and Price had arranged to purchase a quarter-bag or $25 worth of marijuana.  Petitioner told Officer Lopez that their plan had been to buy quantities of marijuana and then resell it at a profit.  A dispute arose over whether the bag of marijuana Montalvo had for sale was worth $25.  (TT7, 76-77).  Petitioner told Officer Lopez that Montalvo reached with his left hand for a gun located between the driver's seat and door.  Montalvo was right-handed.  (TT7, 78-89, 83).  Petitioner claimed that he yelled "gun," and grabbed Montalvo by his left wrist.  Petitioner stated that within two seconds the gun dropped to the floor and Montalvo never regained possession of it.  (TT7, 79).  Petitioner sat on top of Montalvo's lap, holding both his wrists.  Price held Montalvo in a headlock from the back seat.  Petitioner claimed that Montalvo stated that he was going to kill them.  Petitioner responded by pushing on Price's arm, adding more pressure to the point where Jose Montalvo went limp and stopped struggling.  (TT7, 78-79).  After

Montalvo stopped struggling, they let go.  Petitioner stated that when Montalvo came back around,

he resumed struggling.  Petitioner grabbed Montalvo's throat in both his hands and began to strangle

him.  (TT7, 81).  Anthony Price was in the back seat urging petitioner not to let go.  Petitioner

estimated that this went on for five-to-ten minutes.  Eventually, Jose Montalvo stopped breathing.

(TT7, 81).

       Petitioner told Officer Lopez that he and Price had discussed whether they should

report the killing to the police.  McDaniel and Price decided to dispose of Montalvo's body and take

the victim's car back to Alabama.  (TT7, 83).  Officer Lopez related the story of how petitioner and

Price disposed of the victim's body:

> Q.    What does McDaniel say they do after then [sic], what did they do?
>
> A.    They decide to go with Mr. Price's idea.  They are still sitting on the two-track, they take Jose's body from the driver's seat and move it to the back seat, and in the process of doing this Jose's pants and boxer shorts fall down to his knees.  They've got him in the back seat of the vehicle.  Anthony goes to get in the driver's seat  to drive, he says that he sees the gun on the floor, driver's floorboard, puts it in the back seat, they drive further down the two-track, they stop, they take Jose Montalvo's body from the back seat, they are pulling him out.  As they are doing that, now his pants and boxer shorts fall down to his ankles.  They told me instead of trying to pull them back up, it would be easier to pull them off, so they pulled them off, along with, I believe both shoes came off at this point, and a sock, they throw 'em in the back seat, they throw the clothing and shoes in the back seat of the vehicle.
>
> Then they drag Jose Montalvo's body to a wooded are that would have been between the railroad tracks that run north and south along US-131, and that Consumers Energy substation, and its just a small wooded area.  They put the body underneath some trees and shrubs, and then they take branches and grass and try to cover the body up.

(TT7, 83-84).  Officer Lopez testified that petitioner never revealed why he had not left the alleged

gun in the same area where he had dumped Montalvo's body.  (TT7, 89).

Petitioner told Officer Lopez that after they hid Montalvo's body, he and Price went to Sara Engel's house to get more money for the trip back to Alabama.  McDaniel and Price slept overnight in the stolen car, and the next morning Engel gave them $40.  (TT7, 86-87).  Petitioner informed Officer Lopez that he and Price had discarded a CD player, a grill, a child's car seat, and other miscellaneous items in a dumpster at a McDonald's along I-75 in Ohio.  (TT7, 90, 128).  Petitioner offered no explanation why he did not dispose of the gun in this dumpster.  (TT7, 91).

Petitioner claimed that Jose Montalvo's gun had been thrown out the car window somewhere along I-75, "thirty minutes" south of Piqua, Ohio.  (TT7, 89, 94; TT8, 29).  Officer Lopez testified that police received very little useful information regarding this gun's whereabouts:

Q.   Do you talk to them about the importance of whether that gun really existed?

A.   Yes.

Q.   It was important to you, correct?

A.   Well, I felt it was more important to them, and I stressed that.  I told them that it was in their best interests if they could help us pinpoint that gun, whether it was a mile marker or anything, that could lead us to that gun.  Because at this point in time, it was just their story and -- that there was a gun -- you know, it would help them.  It could only help them.  Couldn't hurt 'em at all.

Q.   Did either one of 'em, after you'd given 'em this speech, give you any more information about where they put this supposed gun, other than 30 miles south of Piqua.

A.   I believe it was -- they didn't say 30 miles, it was 30 minutes south of Piqua, so we even got into their speed, how fast were you going, to try to calculate where 30 minutes south of Piqua, Ohio would have been, and they both seemed to come up with 65, 75 miles an hour was their speed, but yet nothing else, nothing was coming to mind for them as far as location.  Talking about were there trees on the side of the highway, what do you remember, anything.

Q.   They didn't give you anything.

A.     Nothing.

Q.     And did they both tell you, when you asked them where the gun went, did they both say about 30 minutes south of Piqua, they give you the same exact answer?

A.     Yes.

Q.     But no detail?

A.     No, neither one of 'em offered any details.

(TT7, 97-98).  Trooper Cress testified that approximately 20 miles south of Piqua, Ohio, is where I-70 and I-75 intersect.  It is a large commercial area with many exits and numerous housing developments.  Thirty miles south of Piqua is downtown Dayton.  (TT7, 10).

Officer Lopez testified that after petitioner's preliminary examination, he had received an inquiry from "the defense" regarding whether the police would be willing to go out and look for the gun if the defendants could provide more detail.  Lopez responded that he would go anywhere they needed him to go to find that gun.  Lopez was never provided with any additional information regarding the gun's location.  (TT 7, 99).

When McDaniel and Price returned to Alabama, they hid the car in a wooded area in Helfin, Alabama, not far from Price's home.  They planned to return later and possibly torch the car and dump it in a river.  When they came back, the car was gone.  It had been impounded by the police.  (TT7, 92).  Petitioner's written statement containing his version of events (Exhibit 49) was admitted into evidence and was available for the jurors to review during deliberations.  (TT7, 71).

Following the close of proofs, the attorneys delivered their closing arguments.  (TT9, 4-96).  The prosecutor argued in favor of first-degree murder convictions on premeditated murder and felony murder theories.  She argued that the claim of self-defense based on the alleged presence

-10-

of a gun made little sense, because petitioner could have picked the gun up off the floor the first time the victim went limp.  Defense counsel argued that McDaniel and Price had acted in self-defense, and that there had not been time to grab the gun off the car floor after the first time Jose Montalvo went limp.  Further, defense counsel argued that defendants did not have the burden to prove anything.  It was the prosecution's burden to show that defendants had not acted in self-defense.

Judge Dennis C. Kolenda delivered the jury instructions.  (TT9, 96-160; TT10, 8-15).  Among other things, he advised the jury that, "The first thing you have to keep in mind when dealing with this claim of self-defense is that a defendant is not obligated to prove that he or she acted in self-defense."  (TT9, 127).  If the jury determined that the defendants acted in self-defense, they were either not guilty of any criminal behavior or were guilty of manslaughter at most.  (TT9, 126).  "A person can't be guilty of murder if in fact they acted in self-defense.  They might be guilty of manslaughter, but they can't be guilty of a murder."  (TT9, 126).  Judge Kolenda instructed the jurors that they would only reach the question of whether defendants had committed murder if they found that defendants had not acted in self-defense.  (TT9, 136).  Defense counsel objected to the court's manslaughter instruction as given, arguing that it should have been described as a "lesser included offense of second degree murder based on provocation."  (TT 9, 161-62; TT10, 15).  Judge Kolenda overruled the objection.  (TT9, 161-62; TT10, 15).

On April 26, 2002, the jury returned a verdict finding petitioner and Price guilty of second-degree murder.  (TT10, 15-16).  On June 17, 2002, petitioner appeared before Judge Kolenda for sentencing.  Petitioner's counsel objected to the scoring of offense variable 7 (OV 7) under Michigan's sentencing guidelines.  MICH. COMP LAWS § 777.37.  Judge Kolenda overruled the objection.  He found that adding the additional points for "excessive brutality" was appropriate,

-11-

given that petitioner admitted strangling Montalvo for approximately five-to-ten minutes before he

died.  On June 17, 2002, Judge Kolenda sentenced petitioner to 20-to-75 years' imprisonment.

(Judgment of Sentence and Commitment to the Department of Corrections, found in Michigan Court

of Appeals record, docket # 31).

   B. <u>Appellate Proceedings</u>

     Petitioner appealed as of right to the Michigan Court of Appeals.  Appellate counsel

raised four issues:

  I. WHETHER TRIAL COUNSEL'S FAILURE TO ADVISE THE POLICE THAT MR. MCDANIEL COULD TAKE THE POLICE WITHIN 5-10 MILES OF WHERE HE THREW THE GUN WAS INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT AND REQUIRES A NEW TRIAL WHERE THE ERROR WAS SO SUBSTANTIAL THAT IT COULD HAVE CHANGED THE OUTCOME OF THE TRIAL[.]

  II. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT REFUSED TO INSTRUCT THE JURY ON THE LESSER OFFENSE OF VOLUNTARY MANSLAUGHTER, IN VIOLATION OF MR. MCDANIEL'S DUE PROCESS RIGHT TO AN INSTRUCTION ON ALL ESSENTIAL ELEMENTS AND ALL DEFENSES SUPPORTED BY THE EVIDENCE, WHEN EVIDENCE PRESENTED WOULD HAVE SUPPORTED A JURY FINDING THAT THE KILLING WAS DONE IN THE HEAT OF PASSION BASED ON ADEQUATE PROVOCATION[.]

  III. WHETHER DEFENDANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 17, ARTICLE 1, MICHIGAN CONSTITUTION OF 1963 WHEN THE TRIAL JUDGE OMITTED TO ADEQUATELY INSTRUCT THE JURY THAT THE DEFENDANT HAVING RAISED THE DEFENSE OF SELF-DEFENSE THE PROSECUTION HAD THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT DEFENDANT DID NOT ACT IN SELF-DEFENSE; AND WHEN THE TENOR OF THE INSTRUCTIONS ON SELF-DEFENSE HAD THE EFFECT OF SHIFTING THE BURDEN OF PROOF ONTO THE DEFENDANT[.]

IV.  WHETHER THE TRIAL COURT BASED ITS SENTENCE ON INCORRECTLY
SCORED GUIDELINES, OVER DEFENSE COUNSEL'S OBJECTIONS.  THUS
THE  TRIAL  COURT  BASED  MR.  MCDANIEL'S  SENTENCE  UPON
INACCURATE INFORMATION IN VIOLATION OF STATE STATUTE AND
MR.  MCDANIEL'S  STATE  AND  FEDERAL  CONSTITUTIONAL  DUE
PROCESS  RIGHTS  TO  BE  SENTENCED  BASED  UPON  ACCURATE
INFORMATION[.]

(Defendant-Appellant's Brief on Appeal at vi-vii, found in Court of Appeals record, docket # 22).

Petitioner raised other additional issues in a *pro se* brief.  (Supplemental Brief on Appeal, found in

Court of Appeals Record).

On April 29, 2004, the Michigan Court of Appeals issued an unpublished opinion

affirming petitioner's conviction and sentence.  The Court of Appeals rejected petitioner's claim of

ineffective assistance of counsel:

> [F]rom our review of the record, defendant McDaniel has established no support for his
> claim of ineffective assistance of counsel.  *People v Toma*, 462 Mich 281, 302-303; 613
> NW2d 694 (2000); *People v Avant*, 235 Mich App 499, 507; 597 NW2d 864 (1999).
> Further, this Court previously denied defendant McDaniel's motion to remand for an
> evidentiary hearing with regard to this issue.  Based on our review of the record, we are
> likewise not persuaded that a remand is warranted.  The record reflects that both defendants
> had a full opportunity to inform the police of the approximate location where they allegedly
> discarded the victim's gun along I-75 in Ohio, but they could only provide information about
> the speed they were driving and an estimated location of about thirty miles or minutes south
> of Piqua, Ohio.  Defendant McDaniel's contention that he told his attorney that he would
> be able to direct the police to within five or ten miles of where the gun was discarded, adds
> little to the information the police already had.  It does not reflect the type of specific location
> that Wyoming Police Officer Jesse Lopez testified that he was seeking.  Nor does it provide
> any basis for concluding that the police would have either found the gun or linked it to the
> victim.  Because nothing in the record suggests that a further elucidation of facts would
> establish the requisite deficient performance or prejudice necessary to establish a claim of
> ineffective assistance of counsel, we reject defendant McDaniel's request to remand this case
> for an evidentiary hearing regarding his claim.

(Op., 3-4).

The Court of Appeals held that the trial court's instruction on imperfect self-defense to the crime of manslaughter was erroneous because the fact that a defendant was engaged in an illegal act did not preclude a claim of self-defense. "[L]awful self-defense will justify or excuse a homicide, even when the crime charged is manslaughter." (Op. at 2) (citing *In re Gillis*, 512 N.W.2d 79, 80 (Mich. Ct. App. 1994)). "Although there are limits on a defendant's ability to claim lawful self-defense, the mere fact that a defendant was engaged in wrongful conduct does not preclude a claim of self-defense." (Op. at 2) (citing *People v. Townes*, 218 N.W.2d 136, 141-42 (Mich. 1974) and *People v. Riddle*, 649 N.W.2d 30, 34-36 (Mich. 2002)(discussing rules applicable to determining whether a person has a duty to retreat, rather than exercise deadly force)). The Court of Appeals found that this instructional error did not undermine the reliability of the jury's verdict finding petitioner guilty of second-degree murder. (Op. at 2). The trial court's instructions "made it clear that lawful self-defense was a complete defense to murder, so the manslaughter instructions were relevant only if the jury found a realistic possibility of lawful self-defense." (Op. at 2). The jury necessarily found that petitioner had not acted in self-defense. Petitioner did not show that it was more probable than not that he would have been acquitted of second-degree murder if his jury had not received the erroneous instruction. (Op. at 2).

The Court of Appeals held that the trial court did not err when it refused to give the requested voluntary manslaughter based on provocation instruction because the evidence did not support that instruction:

> We have also considered defendants' positions that the trial court erred by failing to instruct the jury on voluntary manslaughter based on provocation under traditional common-law principles. We note that provocation is not an actual element of voluntary manslaughter, but constitutes a circumstance that negates the presence of malice. *People v Mendoza*, 468 Mich 527, 536, 664 NW2d 685 (2003); *People v Darden*, 230 Mich App 597, 602-603, 585 NW2d

-14-

27 (1998).  The provocation must cause a defendant to act out of passion, rather than reason. *People v Pouncey*, 437 Mich 382, 389, 471 NW2d 346 (1991).  It must be such that it would cause a reasonable person to lose control.  *Id.* at 389, 471 NW2d 346; *People v Sullivan*, 231 Mich App 510, 518, 586 NW2d 578 (1998), *aff'd* 461 Mich 992, 609 NW2d 193 (2000).

Regardless of whether we examine the evidence in this case under the pre-*Cornell*[3] standard applicable to cognate lesser offenses or by viewing voluntary manslaughter as a necessarily included lesser offense of murder and employing the rational view of the evidence standard set forth in *Cornell* and *Mendoza*, *supra*, we conclude that the trial court properly declined to instruct on voluntary manslaughter based on provocation.  The alleged provocation in this case was that the victim was reaching for a gun.  If believed, however, this evidence did not suggest that defendants were acting out of a loss of control, but rather that they lunged and grabbed the victim in self-defense.  Because the evidence would not have supported a conviction for voluntary manslaughter based on provocation, the trial court properly refused to instruct on that offense.

(Op. at 2-3).

   The Court of Appeals rejected petitioner's argument that the court's jury instructions

had the effect of shifting the burden of proof to petitioner to prove self-defense:

[E]xamining the jury instructions in their entirety, the tenor of the instructions did not have the effect of shifting the burden of proof to defendants to prove self-defense.  *Milton*, *supra* at 475, 668 NW2d 387.  The jury was instructed that the prosecutor had the burden of proof, that the evidence must establish defendants' guilt beyond a reasonable doubt, and that defendants were not obligated to prove that they acted in self-defense.  Both before and after the phrase "adequately established," the trial court instructed the jury that the evidence must prove defendants "did not act in self-defense." Considered in context the trial court's use of the phrase "adequately established" referred to what the evidence would establish, not a defense burden.  We note that the trial court appropriately used the phrase "realistic possibility" to explain the circumstances under which the jury should acquit defendants of murder based on self-defense.  *People v Bowman*, 254 Mich App 142, 149-150, 656 NW2d 835 (2002).  Therefore, defendant McDaniel has failed to show plain instructional error with regard to this unpreserved issue.

(Op. at 3).

   The Court of Appeals rejected petitioner's argument that his due process rights had

been violated because he had been sentenced on the basis of inaccurate information when he received

---

[3]*People v. Cornell*, 646 N.W. 2d 127 (Mich. 2002).

fifty points under OV 7 under Michigan's sentencing guidelines.  The fifty points under OV 7 made

no difference in the petitioner's sentence.  The Court of Appeals found no error in the sentence

imposed by Judge Kolenda  because his reasons for an upward departure from the guidelines were

substantial and compelling:

> Both defendants challenge the trial court's score of fifty points for OV 7, MCL 777.37,
> which applies to all crimes against persons. MCL 777.22(1).  Because the trial court's
> sentencing decision reflects that it would have departed from the sentencing guidelines range
> and imposed the same sentence even if OV 7 were not scored at fifty points, we again find
> no basis for resentencing.  The trial court's stated reasons for departing from the sentencing
> guidelines range in that instance were substantial and compelling. MCL 769.34(11);
> *Babcock*, *supra* at 260, 271, 666 NW2d 231; *see also People v Mutchie*, 468 Mich 50, 658
> NW2d 154 (2003).[4]

(Op. at 4).

Petitioner's application for leave to appeal to the Michigan Supreme Court raised the

four issues his appellate counsel had raised in the Court of Appeals.  (Application for Leave to

Appeal, found in Supreme Court record, docket # 30).  By standard order entered November 22,

2004, the Michigan Supreme Court denied discretionary review.

C.   Habeas Corpus Petition

On February 21, 2006, petitioner filed his petition in the present case.  His *pro se*

petition raised the same four grounds he had raised in the Michigan Supreme Court.  (Petition,

docket # 1).  On April 27, 2006, the court entered an order directing respondent to file an answer or

---

[4]The Court of Appeals noted that petitioner's reliance on *People v. Hernandez*, 503 N.W. 2d
629 (Mich. 1993), as support for his claim that OV 7 was improperly scored was "misplaced." (Op.
at 4 n.1).  "Although the Supreme Court upheld the trial court's determination of 'excessive
brutality' in that case, it did not attempt to judicially define the limits of that term for all forms of
physical abuse.  Rather, the court conducted a fact-specific analysis as to whether the beating
suffered by the assault victim in that case constituted excessive brutality."  (*Id.*).

other pleading in response to the petition.  (4/27/06 Order, docket # 3).  On May 1, 2006, petitioner

filed a motion to voluntarily dismiss Ground I (ineffective assistance of counsel (Petition at ¶ 12(A)))

and Ground III (trial court's instructions had shifted the burden to petitioner to prove self-defense

(*Id.* at ¶ 12(C))).  (docket # 5).  On May 12, 2006, the court entered an order warning petitioner that

if he withdrew these grounds, they would likely be barred in any future petition.  The same order

gave petitioner a thirty-day period within which to withdraw his motion:

> Petitioner [] has filed a motion to dismiss Grounds I and III, stating that he does not wish to
> pursue those claims "at this time" (docket #5).  Petitioner is cautioned that any subsequent
> habeas petition may be "second or successive" within the meaning of 28 U.S.C. § 2244(b).
> Before a second or successive application is filed in the district court, the applicant must
> move in the court of appeals for an order authorizing the district court to consider the
> application. 28 U.S.C. § 2244(b)(3)(A); *see also Tyler v. Cain*, 533 U.S. 656, 661 n.3 (2001)
> (circuit court may authorize the petition upon a prima facie showing that the claim satisfies
> § 2244(b)(2)).  Therefore, if Petitioner withdraws grounds I and III, he may not be able to
> assert them in a future petition.
>
> If Petitioner wishes to proceed with all four of the claims presented in the original petition,
> he must withdraw his motion to dismiss within thirty days.  If he fails to do so, the Court will
> grant his motion to dismiss Grounds I and III.

(5/12/06 Order, docket # 7).  Petitioner did not withdraw his motion.  The court determined that he

intended to abandon Grounds I and III.  Accordingly, on June 29, 2006, Judge Bell entered an order

granting petitioner's motion to withdraw Grounds I and III, and both grounds were dismissed.

(6/29/06 Order, docket # 10).  The remaining grounds in the petition (Petition at ¶¶ 12(B), (D)) are

addressed herein as "Grounds 1 and 2."

## **Applicable Standard**

Because petitioner filed his habeas application long after the April 1996 enactment

of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"),

the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009). *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."   28 U.S.C. § 2254(d).   "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.  A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts."  *Bell v. Cone*, 535 U.S. at 694 (citations omitted).  A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

        "It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007).  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert.*

*denied*, 549 U.S. 1308 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005)("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was

clearly established by Supreme Court precedent as a "threshold inquiry").  "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455).  "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'"  *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings.  28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008).  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Tucker v. Palmer*, 541 F.3d 652, 665 (6th Cir. 2008).

## Discussion

### 1.    Voluntary Manslaughter Instruction

In Ground 1, petitioner argues that his jury should have been instructed on voluntary manslaughter as a lesser included offense of second-degree murder, based on adequate provocation. Habeas corpus is available only if a petitioner is in state custody in violation of the federal Constitution or laws.  28 U.S.C. § 2254(a).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Sanford v. Yukins*,

288 F.3d 855, 860 (6th Cir. 2002) ("State law means what the state courts say it means. A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254."). Within broad constitutional limits, a state has discretion to determine the elements of its own crimes, what proofs are essential to establish the elements of those crimes, and the available defenses. *See Patterson v. New York*, 432 U.S. 197, 210 (1977); *Sanford v. Yukins*, 288 F.3d at 861; *Warner v. Zent*, 997 F.2d 116, 133 (6th Cir. 1993). On habeas review, the federal courts are bound by the state courts' interpretation of their own laws. *See Mullaney v. Wilbur*, 421 U.S. 684, 690-91 (1975); *Warner*, 997 F.2d at 133. "The fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71 (1991); *accord Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief.").

The United States Court of Appeals for the Sixth Circuit, sitting *en banc*, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir.1990) (*en banc*). The *Bagby* Court held that failure to instruct on lesser-included offenses in a non-capital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure. *Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007) (holding that, in a murder case, due process does not require a jury instruction on the lesser included offense of voluntary manslaughter); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002) (same); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (involuntary manslaughter instruction not required by due process); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (voluntary manslaughter

-22-

instruction not required); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001) (same); *Williams v. Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001) (same).  "[N]o clearly established Supreme Court authority requires lesser-included-offense instructions in non-capital cases."  *Samu*, 14 F. App'x at 479.

In the present case, the jury was properly instructed on the elements of first and second-degree murder and self-defense, and it found petitioner guilty of second-degree murder. Petitioner does not challenge the sufficiency of the evidence to support that conviction.  The state appellate court found, as a matter of state law, that the evidence did not support a jury instruction on manslaughter, because petitioner was not acting under legal provocation.  Petitioner can point to no holding of the United States Supreme Court that would remotely suggest that the Constitution required a manslaughter instruction in this case.  To the contrary, the *en banc* Sixth Circuit has held that due process does not require such an instruction.  Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief.

2.      **Sentencing Error**

In Ground 2, petitioner argues that his rights under the Fourteenth Amendment's Due Process Clause were violated when he received fifty points under offense variable 7 (OV 7) of Michigan's sentencing guidelines for aggravated physical abuse, and thus was not sentenced on the basis of accurate information.  Habeas relief is available only on the ground that a petitioner is being held in custody in violation of the federal Constitution or laws.  28 U.S.C. § 2254(a).  A habeas court cannot release a state prisoner on the ground that the conviction or sentence violates state law.  *See Estelle v. McGuire*, 502 U.S. at 67.

-23-

The Michigan sentencing guidelines are designed to guide the exercise of trial-court discretion in the setting of a minimum sentence. MICH. COMP. LAWS § 769.34. The trial judge may depart from the recommended guideline range, as long as the judge articulates "substantial and compelling" reasons for the departure. A Michigan judge's decision in scoring the state guidelines is a pure issue of state law and does not raise a federal question. *See Tironi v. Birkett*, 252 F. App'x 724 (6th Cir. 2007); *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003); *Austin v. Jackson,* 213 F.3d 298, 301 (6th Cir. 2000); *Whitfield v. Martin*, 157 F. Supp. 2d 758, 762 (E.D. Mich. 2001); *Thomas v. Foltz*, 654 F. Supp. 105, 107 (E.D. Mich. 1987). The state sentencing judge's adherence or nonadherence to the guideline range is therefore a matter without constitutional significance.

Petitioner argues that his score under OV 7 of the State's sentencing guidelines violated his rights under the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (Petitioner's Brief at 18-20, docket # 6; Reply Brief at 9-13, docket # 34). This argument is meritless. In *Apprendi*, the Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and found beyond a reasonable doubt." 530 U.S. at 490; *see Oregon v. Ice*, 129 S. Ct. 711, 714 (2009). In Michigan, the maximum sentence is established by statute, not by the trial judge. The statutory maximum sentence for the crime of second-degree murder is "imprisonment in the state prison for life, or any term of years." MICH. COMP. LAWS 750.317. Petitioner's sentence did not exceed the prescribed statutory maximum authorized by the jury's verdict finding him guilty of second-degree murder. Because Michigan's sentencing system involves indeterminate sentencing, in which the maximum is set by law, *Apprendi* and its progeny do not apply to Michigan sentences. *See Blakely v. Washington*, 542 U.S. 296, 308-09 (2004) (indeterminate sentencing system does not

-24-

invade the province of the jury); *Tironi v. Birkett*, 252 F. App'x 724 (6th Cir. 2007) ("Tironi's

sentence does not violate *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L.Ed.2d 403

(2004) because *Blakely* does not apply to Michigan's indeterminate sentencing scheme."), *cert*

*denied*, 128 S. Ct. 1898 (2008); *accord Lipsey v. Bell*, No. 1:08-cv-60, 2008 WL 1836953, at * 4

(W.D. Mich. April 22, 2008) (collecting cases); *People v. Harper*, 739 N.W.2d 523, 530-533 (Mich.

2007).


### Recommended Disposition

For the foregoing reasons, I recommend that the petition be denied.


Dated:  March 23, 2009                          /s/  Joseph G. Scoville
                                                United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within
ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All
objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file
timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474
U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030
(1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).